# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

CHRISTOPHER ROBERTSON, )
)
    Petitioner, )        NO. 3:06-1155
)         JUDGE HAYNES
v. )
)
WAYNE BRANDON, Warden, )
)
    Respondent. )

## MEMORANDUM

Petitioner, Christopher Robertson, filed this pro se action under 28 U.S.C. § 2254, seeking to set aside his conviction for first-degree murder for which he received a sentence of life imprisonment. After a review of the petition, the Court appointed the Federal Public Defender to represent Petitioner and an amended petition was filed. In his amended petition, the Petitioner's claims are: (1) that Petitioner's state trial counsel was ineffective for failing to move for a mistrial based upon a witness's testimony about Petitioner's involvement in a previous murder and his failure to seek a plea offer, to challenge the jury venire and to investigate Petitioner's mental health; (2) that the State's only evidence was the testimony of three accomplices, but the trial judge refused to instruct the jury that Tennessee law does not permit a conviction based solely on an accomplice's testimony; and (3) that the State's evidence is insufficient to support his conviction as required by Due Process Clause of the Fourteenth Amendment. In earlier proceedings, the Court denied Respondent's motion to dismiss this action as untimely. (Docket Entry No. 28).

### A. Procedural History

On July 26, 2000, a jury convicted Petitioner of first degree murder for which Petitioner

received a life sentence. On direct appeal, the Tennessee Court of Criminal Appeals affirmed his conviction and sentence. State v. Robertson, 2002 WL 31188228 (Tenn. Ct. Crim. App. Oct. 2, 2002). The Tennessee Supreme Court denied Petitioner's application for permission to appeal. Id. at 1.

Petitioner filed a post-conviction petition that the trial court denied on the merits. On appeal, the Tennessee Court of Criminal Appeals affirmed. Robertson v. State, 2005 WL 901132 (Tenn. Crim. April 9, 2005). The Tennessee Supreme Court denied Petitioner's application for permission to appeal on October 17, 2005. Id. at *1. Petitioner also filed a state habeas action asserting claims for ineffective assistance of counsel, a defective indictment and uncorroborated and conflicting proof, but that action was dismissed by the trial court and Petitioner's appeal of that order was dismissed as untimely. Robertson v. Dotson, 2005 WL 1249020 (Tenn. Ct. Crim. App. May, 23, 2005).

### A. Review of the State Court Record

### 1. Findings of Fact

Given Petitioner's claims on the sufficiency of the evidence and related claims, the Court sets forth the Tennessee Court of Criminal Appeals lengthy findings of fact.[1] After a review of the preliminary police investigation of the murder of Tonya Denise Battle on February 21, 1999 in Nashville the Tennessee appellate court found as follows:

> The victim was on the sidewalk beside a field that separates the Preston Taylor Homes from the Alameda Terrace Apartments. The residents call this area between the two complexes "the cut." The victim's body was between apartment

---

[1]State appellate court opinion findings can constitute factual findings in a habeas action, Sumner v. Mata, 449 U.S. 539, 546-47 (1981), and have a statutory presumption of correctness 28 U.S.C. § 2254(d).

2

986 and apartment 1000 but was closer to 1000. The temperature was below twenty degrees Fahrenheit, and the victim had her hands in the outer pockets of her gold coat.

Detective Sledge testified that he coordinated the investigation from the crime scene. He said that although a couple hundred people lived within one hundred yards of the murder scene, no one volunteered that they had seen what happened. Detectives Satterfield and Gray went to apartment 968 to interview Karen Mullins and Chris Howse, but those interviews did not indicate that anyone had witnessed the crime. He said that they also investigated the victim's ex-boyfriend but that he had an alibi. He testified that the shell casing found at the scene was partially in mud and had dirt and mud inside it. He stated that it did not appear to be connected to this crime but that they collected it out of an abundance of caution. He said the police were never able to determine whether the shell casing or a lighter found at the scene was related to this case. He stated that at 9:00 a.m. on February 22, 1999, he attended the victim's autopsy. The victim had been shot in the left rear base of her skull and part of the shot exited through her right cheek.

Detective Sledge testified that on February 23, 1999, the Tuesday following the murder, he spoke with Ms. Mullins twice and that he spoke with her again later that week. He said that on each occasion, Ms. Mullins said substantially the same thing she said on the night of the offense. He said that two or three days after the murder, Detective Gray interviewed nine-year-old DeQuan Howse, who lived at 1004 Presslor Drive. He said that DeQuan Howse was the first person to mention a white jacket being connected with the case. He stated that during his investigation, he learned that Chris Howse was really Chris Robertson, the defendant, and that the defendant lived at apartment 968 in the Preston Taylor Homes. He said that he had some information that the defendant was the shooter and might have been wearing a white jacket. He said that he also had information that Ms. Mullins and the victim were wearing a white coat that night. On February 26, 1999, he executed a search warrant at apartment 968 in an attempt to locate the handgun used to kill the victim and the clothing worn during the murder. He stated that he discovered no weapons in the apartment but that he found a white, waist-length jacket.

Detective Sledge testified that in early April, he learned that Mario Newbern was with the defendant on the night of the shooting, and he interviewed Mr. Newbern. He also interviewed Michael Simpson on June 8, 1999, and learned that Mr. Simpson was with the defendant at the time of the murder. He said that he did not arrest Mr. Newbern or Mr. Simpson because he had no proof that they were involved in the murder. He said that neither of them told him that the defendant was wearing a white jacket on the night of the murder. Eventually, the defendant and Ms. Mullins were charged in connection with the crime. He interviewed Ms.

3

Mullins after her arrest on July 26, 1999, and at this time, she changed her story. He said that he made Ms. Mullins no promises in exchange for her testimony in this case.

Karen Mullins testified that at the time of trial, she was charged as an accessory after the fact with regard to the victim's death and was facing a one-to-two-year sentence. She stated that no one had offered her a deal in exchange for her testimony, but she admitted that she was hoping she would get a break. She stated that she was convicted the month before trial of misdemeanor shoplifting or theft.

Ms. Mullins testified that in late 1998 and early 1999, she was living in the Preston Taylor Homes. She said that she got to know the victim and the defendant from living in this area. She said that she and the victim were associates but not close friends. She said that she and the defendant became intimate and that he began living with her. She said that the day of the victim's death was a Sunday and that the victim came to her apartment that morning and persuaded her to stay home from church in order that they could spend time together. She said that the defendant, her two daughters, and her son were also there that morning. She said that the defendant, who was wearing a black leather coat and blue jeans, was in and out of her apartment all day. She said that later in the day, she borrowed a radio from a neighbor and she lent the victim five dollars to buy some beer.

Ms. Mullins testified that around 3:30 or 4:00 p.m., the victim said that she had to do something with the defendant, who was not there at that time. Ms. Mullins said that the defendant, Mario Newbern, Michael Simpson, and a woman named Rosalyn came to her apartment around 5:00 p.m. She said that the defendant told the victim to come with him and that he left with the victim, Mr. Newbern, and Mr. Simpson. She said that thirty to forty-five minutes later, the men returned without the victim. She said that the police had stopped Mr. Simpson, who had been driving the group, and that the defendant told her to go outside and see what was happening. She said that she did not see the victim talking to the police. She said that the police drove Mr. Simpson away in a police cruiser and then returned him. She said that Mr. Simpson returned to her apartment and that he, the defendant, and Mr. Newbern walked to Karen Wilson's apartment.

Ms. Mullins testified that she decided to find the victim in order to retrieve a red, white, and blue Nautica jacket that the victim had borrowed from her earlier that day. She said that she found the victim at a neighbor's apartment and that the victim said that she would meet Ms. Mullins at Ms. Wilson's apartment with the jacket. Ms. Mullins said that she went to Ms. Wilson's apartment where she heard the defendant threaten to kill the victim. She said that Mr. Newbern and Mr. Simpson were also there when the defendant threatened the victim. She said that the defendant would often list people that he was going to kill and that she did not

4

take him seriously. She said that the victim arrived a few minutes later, and Ms. Mullins overheard the defendant tell the victim that a man in another housing project wanted a trick. She said that the victim said she would go. Ms. Mullins said that she was at Ms. Wilson's apartment for five to ten minutes before she walked home with her son. She said that as she left, the defendant, the victim, Mr. Newbern, and Mr. Simpson were also leaving in a different direction. She said that she later heard a gunshot but that she did not look outside because shooting occurred every day and night at Preston Taylor Homes.

Ms. Mullins testified that when the defendant, Mr. Newbern, and Mr. Simpson returned to her apartment that night, she did not know that the victim had been shot. She said that the police arrived at the Preston Taylor Homes but that she did not go outside. She said that later that evening, she learned that the victim was dead. She said that when the police came to talk to her, she told the police that they were in bed. She said the police did not ask her about the defendant. She stated that the following Tuesday, the defendant began acting strangely. She asked him if he had killed the victim but said that he did not respond. On Thursday night after the Sunday shooting, she again asked the defendant if he had shot the victim. She said he told her that if she said anything about it, he was going to kill her and her children. She said she took this threat seriously. She said she told the police about the events that she testified to at trial when she was arrested in July 1999.

Ms. Mullins testified that the defendant had a small .22 caliber gun but that he gave it back to the man who had pawned it to him before the victim was shot. She said that the defendant kept rifles at her apartment but that on the day after the shooting, he removed all of his guns from her apartment. She denied knowing the shooting was going to occur or having any role in the killing. She also denied covering up anything and said she did not know why she had been charged in the case.

On cross-examination, Ms. Mullins testified that once or twice during the time they knew each other, she and the victim disagreed about things the victim and others had said but that she and the victim never really argued. She said she gave the victim money on occasion. Ms. Mullins said she was wearing a sweater, not a white coat, on the night of the shooting, but she admitted she had worn a white coat before. She said no one had on a white coat that night.

Ms. Mullins testified that on the night of the shooting, she and the victim arrived at Ms. Wilson's apartment at practically the same time but entered through different doors. She said that the defendant threatened to kill the victim as the victim came in Ms. Wilson's back door and that the victim may not have heard him. She said that Mr. Simpson heard the defendant threaten to kill the victim and that if he denied hearing the threat, he would be lying. She said her son also

5

overheard the defendant threaten the victim and told the defendant not to kill the victim because the victim was a woman. She said both Mr. Newbern and Mr. Simpson were acting normally that night and did not seem reluctant to be there.

Ms. Mullins testified that Ms. Wilson later came to Ms. Mullins' apartment and was there when the men returned. Ms. Mullins denied knowing that the victim had been shot or crying and being upset at this time. She said that five to ten minutes after the men returned, she and the defendant went to bed and had sex. She said that they were about to fall asleep when someone knocked on the window and said that the victim was dead. She said that after someone else reported the same thing, she dressed and that she and the defendant went to see the victim's body. She said that a group of people were already looking at the body. She said that the time from the return of the men to her apartment and her leaving to see the body was longer than ten minutes and could have been as much as one to two hours. She stated that the police had not arrived yet and that she began knocking on doors, including Shonda Howse's door, in order to try to call an ambulance. She said she was wearing a black Raiders coat at this time. She said that she and the defendant returned to her apartment and that he told her to go get Ron D. She said that she and Mr. Simpson went outside and that the police were at the crime scene.

Ms. Mullins testified that on the night of the victim's death, a detective came to her apartment asking when she had last seen the victim. She said she told the detective that she had been in bed. She said the detective did not ask about the defendant. She said that detectives came to her apartment again the following day and that she told them when she had last seen the victim. She said the defendant had not admitted shooting the victim at this point. She said that on the Tuesday following the shooting, the defendant told her that his mother was taking him downtown for questioning. She said this was when she first asked him if he killed the victim. She denied telling Detective Sledge in her July 1999 statement that she asked the defendant if he shot the victim on the night of the murder, that she asked him again later that night when he had been tossing and turning in bed, or that he admitted that he shot the victim on the day following the murder. She said that the defendant did not respond to her questions about whether he shot the victim until Thursday when he threatened to kill her and her children. She said she waited until she was arrested to tell the police what really happened because she was afraid of the defendant and that she might be charged with murder.

Mario Newbern testified that he was twenty-one years old and that in February 1999, he was living in the Georgia Court Apartments with his sister. He said he knew the defendant because they had previously been in Woodland Hills Youth Development Center together. He said he knew the victim and Karen Mullins from the Preston Taylor Homes neighborhood. He said that during the day on

6

February 21, 1999, the defendant came to Georgia Court, pointed a gun at him, and told him to come with the defendant. He said that the defendant gave him a .22 caliber automatic weapon and that he helped the defendant rob some Mexicans. He said that he did not shoot anyone and that the defendant took the gun back afterward. On cross-examination, he stated that he had a rifle instead of a pistol.

Mr. Newbern testified that later that day, he, the defendant, and Michael Simpson went to a party at Ms. Mullins' apartment in Preston Taylor Homes. He said that the victim was there and that he believed Ron D. was also there. He said the defendant told him that the defendant was going to kill the victim. He said Mr. Simpson and Ms. Mullins were present when the defendant said this. He said he, the victim, the defendant, and Mr. Simpson left Ms. Mullins' apartment and walked toward the cut to Alameda Terrace Apartments. He said he was in front, the victim was behind him, the defendant was behind her, and Mr. Simpson was in the rear. He said that he heard the defendant say "bitch" and that one second later, he heard a gunshot. He said he turned around and saw the victim lying on the ground with a gunshot wound to the head. He said blood was on the ground and the victim was not moving. He said the defendant was putting a black revolver in his jacket pocket. He said that the victim was shot around 10:30 p.m.

Mr. Newbern testified that the defendant told them to walk away and that he, the defendant, and Mr. Simpson walked to Ms. Mullins' apartment, arriving there one minute after the shooting. He said that Ms. Mullins and her children were there and that the defendant told Ms. Mullins that she did not have to worry about the victim anymore, "She ain't talking." He said Ms. Mullins looked like she wanted to cry. He said someone knocked on the door and said that the victim was dead. He said he, the defendant, Ms. Mullins, and Mr. Simpson walked around outside before the police arrived and that the defendant and Ms. Mullins were knocking on doors. He said they did not leave Ms. Mullins' apartment again after the police arrived at the crime scene. He said the defendant told him to stay at Ms. Mullins' apartment until the detectives came. He said that after the defendant went to sleep, he stayed at Ms. Mullins' apartment until after the detectives left, which was around 1:00 a.m. He said that the police asked him if he had seen the victim in the last hour and he denied seeing her because the defendant told him to say that. He said he then left and went home alone.

Mr. Newbern testified that a couple of months after the shooting, he spoke with a detective and gave the same account to which he was testifying at trial. He said he also spoke with the defendant's lawyer. He said he told the lawyer that they were at the party but that he did not say anything about the shooting because he did not know who the lawyer was.

7

On cross-examination, Mr. Newbern testified that he told Detective Sledge that the defendant came and got him at Georgia Court and took him to Ms. Mullins' apartment. He said that when they arrived, he saw Ms. Mullins, her son Michael, Ms. Wilson, Mr. Simpson, and the victim there listening to music and smoking "blunts." He admitted telling Detective Sledge that the defendant asked if they wanted to make some money. Mr. Newbern testified that actually, Mr. Simpson, who was not involved in the robbery of the Mexicans earlier that day, picked him up and took him to Presslor Drive where Ms. Mullins lived. He said that while he was at Ms. Mullins' apartment, the defendant told him to carry the defendant's shotguns to Ms. Wilson's house. He said he, the defendant, the victim, and Mr. Simpson went from Ms. Mullins' apartment to Ms. Wilson's apartment and left from Ms. Wilson's apartment to go to Alameda Terrace. He said they took all of the guns, including the .22 caliber, to Ms. Wilson's apartment before the shooting. He said that after the shooting, he, the defendant, and Mr. Simpson were upset about it. He said that the shooting continued to bother him for two weeks. He denied that he was the one who shot the victim.

Mr. Newbern agreed that the defendant's detective, Patrick Wells, came to interview him on July 10, 2000. He said that Mr. Wells did not identify himself at first. He denied telling Mr. Wells that on the night of the murder, he saw Ms. Mullins and the victim leave Ms. Mullins' apartment together. He also denied telling Mr. Wells that the defendant was in bed asleep when the victim was shot. He said that when Mr. Wells returned with a subpoena and identified himself, he did not tell him the truth because Mr. Newbern was coming to court. He denied telling Detectives Sledge and Gray that the defendant was wearing a white coat on the night of the shooting. Although at first he denied seeing a white Nautica jacket, he subsequently agreed that Ms. Mullins was wearing a white jacket on the night of the murder. He said that he did not know the name brand of her jacket. He said that the defendant wore a black coat that night. He denied discussing his testimony with Ms. Mullins and Mr. Simpson.

Patrick Wells, the defendant's private investigator, testified that on July 10, 1999, he interviewed Mario Newbern. He said that he identified himself to Mr. Newbern by giving him a business card and telling him that he was working for the defendant. He said that Mr. Newbern told him that Mr. Newbern was at Ms. Mullins' party; that the defendant fell asleep; and that sometime after 10:00 p.m, Ms. Mullins and the victim left together.

Michael Simpson testified that he was nineteen years old at the time of trial and had known the defendant about one month before the victim's death. He said he believed that he and the defendant were related through his grandfather. He said that in February 1999, he would see the victim from time to time but that he did not really know her. He said that he knew Ms. Mullins, who was the defendant's

8

girlfriend at that time, and that she allowed him to stay at her apartment in Preston Taylor Homes. He said that on Sunday, February 21, 1999, he was at Ms. Mullins' apartment all day. He said he, the defendant, Mario Newbern, Ms. Mullins, and the victim were together at Ms. Mullins' apartment that evening. He said that the defendant was going to Alameda Terrace and that the victim said she was going with him. He said he thought that they were going to the home of a friend that the defendant knew at Alameda Terrace. He said that on the way to Alameda Terrace, Mr. Newbern walked beside the victim, that the defendant was behind the victim, and he was behind the defendant. He said that when they were between the two apartment complexes, the defendant screamed out "bitch," pointed a black .38 caliber revolver at the back of the victim's head, and shot her. He said that the victim was talking just before she was shot but that he was not paying attention to what she was saying. He said that the defendant had pulled the gun from a pocket.

Mr. Simpson testified that after the shot, the victim fell and everyone froze for a minute. He said that the defendant told them to walk, not run, and that they walked to another Karen's apartment. He said that after a minute, they went to Ms. Mullins' apartment. He said the defendant told them if they told anyone, he would kill them. He said he believed the defendant. He said that about a month later, Detective Sledge contacted him and that he told Detective Sledge what he had seen. On cross-examination, he agreed that he did not speak to the police until June 8, 1999. He said he waited almost four months to tell about the shooting because he did not want to die.

On cross-examination, he denied taking Mr. Newbern to Ms. Mullins' apartment on the day of the shooting. He stated that at Ms. Mullins' apartment, he did not hear the defendant threaten the victim but that he was not paying attention to what the defendant was saying. He agreed that he would not have accompanied the defendant to Alameda Terrace if he had heard the defendant threaten the victim. He denied shooting the victim or knowing what was going on when the victim was shot.

Mr. Simpson testified that when they returned to Ms. Mullins' apartment after the shooting, she was crying. He said that no one was wearing a white Nautica coat that night and that he and the other two men wore black jackets. He said he did not remember what type of jacket Ms. Mullins wore that night. He said he did not know of Ms. Mullins leaving her apartment before the police arrived at Preston Taylor Homes after the shooting. He said that after the police and ambulances arrived that night, he and Ms. Mullins walked over to a friend's apartment near the body but no one answered the door. He said that when they returned to Ms. Mullins' apartment, the defendant told him to stay there. He said Mr. Newbern left and that Mr. Simpson and the defendant walked to Georgia Court. He denied knowing whether Mr. Newbern had a .22 caliber gun when he left. He said he

9

never saw the defendant point a gun at Mr. Newbern. He said that in the days following the shooting, he continued to stay at Ms. Mullins' apartment because the defendant told him that the defendant did not want him to go anywhere and because he had nowhere else to stay. He stated that he had not talked with Mr. Newbern or Ms. Mullins about the case while waiting to testify.

Delores Morris, the victim's mother, testified that the victim was thirty-three years old at the time of her death. She said the victim was staying with different people in the Preston Taylor Homes area at that time. She said that about three weeks before the victim's murder, she overheard the victim and the defendant talking in front of a store across from Preston Taylor Homes. She said the defendant told the victim, "Get out of my face, junkie bitch, before I kill you before I'm going to kill you anyway."

Dr. Bruce Phillip Levy, the County Medical Examiner for Metropolitan Nashville and Davidson County, testified as an expert in forensic pathology. On February 22, 1999, he performed an autopsy on the victim. The victim was shot in the back of the head with the bullet entering at the base of her skull and exiting through her right cheek. Dr. Levy said that the bullet severed the victim's spinal cord and that the wound was instantly incapacitating and nearly instantly fatal. He collected bullet fragments from the victim's right cheek, but he said neither the fragments nor the wound allowed him to determine the type of bullet used. He said that the victim also had abrasions and lacerations around the bony tissues on the left side of her face that were consistent with the victim striking the ground. He said that the lack of gunshot residue on the victim indicated that the gun was at least two to three feet away from the victim when fired. He said that the victim's hair could have filtered out the gunshot residue. He stated that a toxicology test revealed that the victim's blood contained tetrahydrocannabinol, the active ingredient in marijuana; cocaine; and a cocaine metabolite. He said the presence of cocaine in the victim's blood meant that she had used cocaine within several hours of her death. He said the test did not reveal the presence of alcohol in the victim's blood.

Detective Sledge was recalled by the defendant and testified that he interviewed Ms. Mullins on July 26, 1999. He agreed Ms. Mullins told him that when the defendant, Mr. Newbern, and Mr. Simpson returned to her apartment on the night of the victim's death, she asked the defendant if he shot the victim. He said Ms. Mullins told him that the defendant did not respond. He agreed that Ms. Mullins told him that later that night while she and the defendant were in bed, she again asked him if he had shot the victim but that he did not respond. He acknowledged that Ms. Mullins told him that on the Monday following the shooting, the three men returned from the store. He said she told him that she again asked if he did it and that the defendant told her that he shot the victim but that he would kill her if she told anyone. He said that he did not recall Ms. Mullins saying that the

defendant told her this on a Thursday but that she was repeatedly asking the defendant about the shooting and getting no answer.

Detective Sledge testified that during his interview, Mr. Newbern told him that the defendant was wearing a white nautical jacket. He said that at that time, he was not aware that Nautica was a brand name and that at the time of trial, he now believed that Mr. Newbern had said Nautica instead of nautical. He explained that the question about how the defendant was dressed was not asked in the context of the time of the shooting. Detective Sledge said that he saw the defendant wearing a white Nautica jacket when he interviewed the defendant on Tuesday, February 23, 1999, and that he recovered this jacket from the apartment in Preston Taylor Homes where the defendant stayed. He said this was the only white jacket found in the apartment. He recalled that there was a jacket that had been borrowed and worn by many people at Preston Taylor Homes, but he said that he did not know if it was the white Nautica jacket. He said that after charges were placed against Ms. Mullins in July 1999, she told him that the defendant was wearing a long, black leather coat on the night of the shooting.

Erica Howse, the defendant's cousin, testified that on the night the victim was shot, she was at her sister's apartment at 1004 Presslor Drive where she was living at the time. She heard a gunshot that evening but did nothing about it because she heard shots everyday in that area. About five minutes later, someone knocked on the door, and Karen Mullins ran into the apartment. She said Ms. Mullins was wearing a white, South Pole bomber jacket. The police arrived at Preston Taylor homes around fifteen minutes after she heard the gunshot. Ms. Howse said that earlier that day, she had attended a party at Ms. Mullins' apartment. She said that the defendant, the victim, Mario Newbern, and Michael Simpson were at Ms. Mullins' apartment while she was there.

DeQuan Howse testified that he was eleven years old at the time of trial. He said he knew the victim and the defendant, who is his cousin. He said that on the night the victim was shot, he was nine years old and living with his mother Shonda Howse and with his aunt Erica Howse. He said that the windows in his bedroom face the back of the apartment building and that on the night in question, he had his window opened slightly because it was hot in his room. He said that from his window, he saw a woman who was screaming "please don't shoot me." He said he later learned that the woman was the victim. He said two people were with the victim. He stated that one of the people wore a white coat and that he could not tell if the person was male or female. He said that the other person was a man dressed all in black. He said that the victim was looking at the man in black, who took a gun from his pocket and shot the victim. He said that once the bullet hit the victim, she turned her head and fell. He said both people ran away. He said the victim had her hands in her pockets during the entire incident. He said the shooter

11

did not look like the defendant. He agreed that he did not get a good look at the people and that it was about thirty feet from the victim to his window. He said that although a street light was near the area where the victim was shot, that the area was not well-lit. He said that after the shooting, he told his uncle what he had seen but that his uncle did not believe him and that he went back to bed. He denied discussing the shooting with his family after the night of the murder.

Shonda Howse, the defendant's first cousin, testified that on February 21, 1999, she was living at 1004 Presslor Drive near where the victim was killed. She said her son DeQuan Howse's room is upstairs, faces the back of the building, and has windows facing the backyard. She said she heard a gunshot that evening but did not do anything about it because gunshots were common. She said that after the gunshot, her son was looking out of his window and kept telling her that someone was there. She said she told him to go to sleep. She said that ten to fifteen minutes after the gunshot, Karen Mullins came to her door wearing a white coat. She said Ms. Mullins told her that the victim was lying on the sidewalk in the back and was dead. She said that she accused Ms. Mullins of lying but that Ms. Mullins said she knew it was the victim because she had just walked from Alameda Terrace, which is directly behind Ms. Howse's apartment. Ms. Howse said she ran outside and saw the victim's body. She said that later, she viewed the scene from her son's window. She said it was six yards from the window to the ground and then nine yards over to the body. She said she did not discuss this event with her son afterward because he went to stay with his father.

Corey Austin testified that she was living in apartment 1012 on the night that the victim was shot. She said that she heard the gunshot but that shooting occurred so often in the back that she did not pay any attention to it. She said that about three to four minutes after the gunshot, someone knocked on her door and used her telephone to call the police. She agreed that the person was Karen Mullins. She said that she did not recall what Ms. Mullins was wearing.

> The transcript of the evidence reflects that the witness agreed that the person was Karen "Mulling," but from the context of the question and the witness's statement that the woman she saw that night was outside the courtroom in the hall, it is evident that Ms. Austin meant Karen Mullins.

Based upon this testimony, the jury convicted the defendant of first degree, premeditated murder.

Robertson, 2002 WL 31188228, at **1-10 (Tenn. Crim App. 2002).

The Tennessee Court of Criminal Appeals made additional findings in Petitioner's post

12

conviction appeal that are set forth in connection with Petitioner's specific claims.

## B. Conclusions of Law

Petitioner's habeas petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). <u>Lindh v. Murphy</u>, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding:

28 U.S.C. § 2254(d).

In <u>Williams v. Taylor</u>, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States" as referring to "holdings, as opposed to dicta" of its decisions "as of the time of the relevant state-court decision." <u>Id.</u> at 412. In <u>Bell v. Cone</u>, 535 U.S 685, 693 (2002), the Court reiterated that AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under the law."

Under the "unreasonable application" clause, a state court judgment results in an

13

"unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. The Supreme Court explained that a state court's application of clearly established federal law must be "objectively unreasonable," and a federal habeas court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A state court's application of federal law is also unreasonable if the "state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)).

In reaching this decision, the Supreme Court reiterated that the claims were to be decided on the record before the state court:

> In this and related contexts <u>we have made clear that whether a state court's decision was unreasonable must be assessed in light of the record the court had before it.</u> See Yarborough v. Gentry, 540 U.S. 1, 6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam) 124 S.Ct., at 4 (denying relief where state court's application of federal law was "supported by the record"); Miller-El v. Cockrell, 537 U.S. 322, 348, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (reasonableness of state court's factual finding assessed "in light of the record before the court"); cf. Bell v. Cone, 535 U.S. 685, 697, n. 4, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).

Holland v. Jackson, 542 U.S. 649, 652 (2004) (emphasis added). The district court also "must presume that all determinations of factual issues made by the state court are correct unless the Defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 738 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). This presumption includes

credibility findings of the state courts.  Skaggs v. Parker, 235 F.3d 261, 266 (6th Cir. 2001).

## 1. Sufficiency of the Evidence

For a Fourteenth Amendment claim based upon insufficient evidence, in Jackson v. Virginia, 443 U.S. 307 (1979), the Supreme Court set forth the standard for reviewing such claims.

> ...[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.  But this inquiry does not require a court to `ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.'  Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution.  The criterion thus impinges upon `jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

Id. at 318-19 (emphasis added with footnotes and citations omitted).

Circumstantial evidence, if sufficient to establish an element of the offense, satisfies constitutional requirement of due process, Wiley v. Sowders, 669 F.2d 386, 390 (6th Cir. 1982) (per curiam), and such evidence need not remove every reasonable hypothesis except that of guilt.  Tilley v. McMackin, 989 F.2d 222, 225 (6th Cir. 1993).  Uncorroborated accomplice testimony is sufficient to support a conviction under the United States Constitution, Takacs v. Engle, 768 F.2d 122, 127 (6th Cir. 1985).  The sufficiency of the evidence extends only to the elements of the crime, not to the state's burden to prove the absence of an affirmative defense,

15

unless the state has made the absence of a defense an element of the crime. See Allen v. Redman, 858 F.2d 1194, 1196-98 (6th Cir. 1988). At that point, sufficiency of evidence on the issue will be relevant. Id. at 1197-98.

Hearsay evidence can be used to support a state conviction provided it qualifies as an exception to the hearsay rule. White v. Illinois, 502 U.S. 346, 355-57, 356 n.8 (1992). The standard is whether the hearsay evidence carries sufficient guarantees of trustworthiness. Curro v. United States, 4 F.3d 436, 437 (6th Cir. 1993). It is unnecessary to establish the unavailability of the declarant, if the hearsay statements were made in a prior court proceeding. United States v. Inadi, 475 U.S. 387, 394 (1986). Inadmissible hearsay testimony, however, of a non-testifying codefendant that clearly implicates the defendant, cannot be admitted against the defendant as this would violate his right to confront his witnesses. Richardson v. Marsh, 481 U.S. 200, 208 (1987).

An issue concerning admissibility of evidence does not arise to a level of constitutional magnitude unless it can be viewed as so egregious that petitioner was denied a fundamentally fair trial. Cooper v. Sowders, 837 F.2d 284, 286 (6th Cir. 1988). To warrant habeas relief, the excluded evidence must be critical, that is, the evidence must "tend to exculpate" the petitioner and also must contain "persuasive assurances of trustworthiness." Turpin v. Kassulke, 26 F.3d 1392, 1396 (6th Cir. 1994). Otherwise, a question of purely state law rarely serves as a basis for habeas corpus relief. Estelle v. McGuire, 502 U.S. 62 (1991). "Today, we reemphasize that it is not the province of a federal habeas court to reexamine state court determinations on state law questions." Id. at 67-68. Rulings by a state's highest court with respect to state law are binding on the federal courts. Wainwright v. Goode, 464 U.S. 78, 84 (1983) (per curiam). The Court is

bound by decisions of an intermediate state appellate court unless convinced that the highest state court would decide the issue differently. Olsen v. McFaul, 843 F.2d 918, 929 (6th Cir. 1988).

On direct appeal, the Tennessee Court of Criminal Appeals concluded that the State's evidence was sufficient to support the jury's verdict and reasoned as follows:

> The defendant contends that the evidence is insufficient to support his first degree murder conviction. Specifically, he argues that Karen Mullins and Mario Newbern gave inconsistent testimony about the events surrounding the murder and that evidence existed that Ms. Mullins was with the victim at the time of the shooting and had a motive to kill the victim. He concludes that no rational jury could have found him guilty. The state contends that the evidence is sufficient to convict the defendant. We agree with the state.
>
> *   *   *
>
> First degree, premeditated murder is defined as a "premeditated and intentional killing of another." Tenn.Code Ann. § 39-13-202(a)(1). Additionally, "premeditation" is defined as
>
>> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.
>
> Tenn.Code Ann. § 39-13-202(d). The element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has noted the following factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. Id.
>
> Viewed in the light most favorable to the state, we believe that the evidence is sufficient to support the defendant's conviction. Mario Newbern and Michael Simpson testified that while they were walking to Alameda Terrace with the

victim and the defendant, the defendant pulled a gun from his jacket pocket and shot the victim in the back of the head. Nothing in the record indicates that the victim was armed at the time of the shooting, and the deceased victim was found with both hands in her pockets. Karen Mullins and Mario Newbern testified that on the day of the murder, the defendant threatened to kill the victim. Additionally, the victim's mother testified that she overheard the defendant threaten to kill the victim three weeks before the victim's death. Finally, Mr. Newbern and Mr. Simpson testified that the defendant instructed them to walk, not run, from the murder scene. Taken in the light most favorable to the state, this testimony reveals that the defendant was calm immediately after the killing. The evidence presented at trial supports the defendant's conviction for first degree, premeditated murder.

In challenging the sufficiency of the evidence, the defendant emphasizes inconsistencies in the witnesses' testimony and evidence suggesting that Ms. Mullins was the perpetrator of the crime. He contends that the proof shows that Ms. Mullins had a motive to kill the victim because she had lent the victim money in the weeks preceding the crime, had disagreements with the victim, and had seen the victim with the defendant, whom she was dating. He also argues that the evidence reveals that Ms. Mullins had the opportunity to kill the victim. He points to Patrick Wells's testimony, which he argues exonerates him and places Ms. Mullins with the victim at the time of the shooting. Although he acknowledges that at trial, Mr. Newbern denied telling Mr. Wells this, he maintains that the jury could not reasonably believe Mr. Newbern because of his testimony that the defendant forced him to commit robbery on the morning of the victim's death and that he attended a party with the defendant that afternoon. Additionally, he states that DeQuan Howse saw an individual in a white coat with the victim at the time she was killed and that proof exists that Ms. Mullins was wearing a white coat on the night of the murder. Finally, he argues that Ms. Mullins' testimony is of limited value because it is filled with inconsistencies.

We note that the jury heard the evidence implicating Ms. Mullins yet determined that the defendant committed the crime. As for the inconsistencies in the witnesses' testimony, the credibility and weight to be given to a witness's testimony are issues to be resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn.Crim.App.1987). The jury heard the inconsistencies and alternate theories raised by the defendant and decided to accredit the state's theory of the offense. The evidence is sufficient.

Robertson, 2002 WL 3118228 at **10-12.

On Petitioner's post-conviction, the Tennessee Court of Criminal Appeals again found the following facts sufficient to justify Petitioner's conviction:

18

The following summarizes the evidence presented at the petitioner's trial in the light most favorable to the state, as the jury's guilty verdict accredited this version of the evidence. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn.1982). On February 21, 1999, the petitioner shot Tonya Denise Battle, a fellow resident of the Preston Taylor Homes in Nashville, Tennessee. The petitioner's girlfriend, Karen Mullins, testified that the petitioner had been living with her at the time of the shooting. On the day of the crime, Mullins and a friend of the petitioner's, Mario Newbern, both heard the petitioner threaten to kill the victim. Later, the petitioner told the victim that a man in another housing development wanted a "trick," and the victim agreed to go. Id. at 4. The petitioner, Newbern, Michael Simpson, and the victim left shortly thereafter. Id. When walking to the other housing development, the petitioner shouted "Bitch!" and then shot the victim. Id. at 6-7. The petitioner threatened to kill Simpson and Newbern if they told anyone about the shooting. Id. at 6-8. The petitioner then walked to Mullins' apartment and told her that she no longer had to worry about the victim because she "ain't talking." Id. at 6.

The medical examiner was unable to determine the type of bullet used to shoot the victim. Id. at 8. Newbern testified that earlier on the day of the shooting, the petitioner gave him a .22 caliber automatic weapon so that Newbern could help the petitioner commit a robbery. Id. at 5-6. After the robbery, the petitioner reclaimed the weapon. Id. at 6.

In his direct appeal, the petitioner challenged the sufficiency of the evidence to support his conviction, the trial court's failure to give certain jury instructions, and the trial court's failure to declare a mistrial after the victim's mother testified that the petitioner had been involved in another murder. Id. at 1. This court affirmed the judgment of the lower court. Id. at 19.

Robertson, 2005 WL 901132, at 1.

In sum, this claim rest principally upon credibility issues, *i.e.*, on whether the State's witnesses were accomplices. The jury determined those credibility issues against Petitioner and under Skaggs, those and all credibility decisions are entitled to a presumption of correctness. 235 F.3d at 266. Applying Jackson, the Court concludes that state court's decisions on the sufficiency of the evidence to support Petitioner's murder conviction are not contrary to clearly established Supreme Court precedent. Thus, this claim does not warrant habeas relief.

19

## 2. Ineffective assistance of Counsel

As to his ineffective assistance of counsel claims, the Tennessee Court of Criminal Appeals found as follows, citing federal law. Robertson, 2005 WL 901132 at *3:

> The petitioner subsequently filed a post-conviction petition alleging that he received ineffective assistance of counsel. The post-conviction court conducted an evidentiary hearing, and the petitioner and his mother testified on his behalf. Both the petitioner and his mother testified that the petitioner had a history of "acting out" and violent behavior and that between the ages of 14 and 16, the petitioner was in state custody at Cumberland Hall, where he received medication for his condition. The petitioner testified that although he relayed this information to his counsel, counsel did not further investigate the issue.

> The petitioner also testified that his counsel failed to discuss any plea bargain offers with him, failed to advise him of his chances of success at trial, and failed to review the state's discovery with him prior to trial. The petitioner further complained that while his counsel objected to the fact that his jury pool contained no African Americans, counsel did so only after the petitioner drew the issue to his counsel's attention, and counsel failed to raise the issue on appeal. The petitioner also complained that counsel met with him only once or twice before his trial and that counsel failed to adequately investigate his case. On cross-examination, the petitioner admitted that a trial witness testified that he was not the shooter; however, he denied that his counsel was responsible for procuring that witness.

> Next, the petitioner's trial counsel, who also represented the petitioner on direct appeal, testified at the post-conviction hearing. Counsel testified that he was appointed to represent the petitioner when the petitioner's former trial counsel ceased representing the petitioner. Upon receiving the petitioner's file, counsel hired a professional investigator, who interviewed all of the witnesses listed on the indictment. Counsel testified that he believed that he had sufficient information to conduct the petitioner's defense and recalled meeting with the petitioner five or six times before trial. Furthermore, he never had any concerns about the state of the petitioner's mental health nor felt the need to have the petitioner's mental health evaluated.

> Regarding the petitioner's allegation that counsel should have appealed the issue of the lack of African Americans in the petitioner's jury pool, counsel testified that he did not believe that the issue warranted appellate relief because to be successful on appeal, counsel would have had to demonstrate systematic exclusion. After researching the issue, counsel learned that a computer program randomly selected the members of the jury pool. Therefore, counsel concluded that he would be

20

unable to prove systematic exclusion and, accordingly, did not pursue the issue on direct appeal.

Regarding the petitioner's claim that his counsel provided deficient performance by failing to object or request a mistrial after a trial witness testified that the petitioner was involved in another murder, counsel testified that he did not request a mistrial because the petitioner did not want him to do so. Counsel opined that the trial went as well as it could have for the petitioner, and although there was some damaging and prejudicial evidence, such as this witness's testimony, other testimony was beneficial to the petitioner and discredited the victim and some of the state's witnesses.

Regarding the petitioner's history of mental health problems, counsel testified that if he had been presented with the mental health records that the petitioner provided to the post-conviction court, he may have requested funds to have the petitioner's mental health professionally evaluated. Counsel further testified that the defense theory was mistaken identity, namely that the petitioner was being framed for this murder by witnesses who had a motivation to lie. The petitioner never admitted guilt to counsel, and therefore counsel never pursued a defense theory based on the petitioner's poor mental health.

Finally, counsel recalled that the state never made a plea bargain offer in the petitioner's case, and therefore counsel had no such offer to convey to the petitioner.

*    *    *

Turning first to the petitioner's claim that his counsel failed to discuss any plea bargain offers with him, counsel testified and explained that the state was not interested in negotiating a plea agreement with the petitioner, and therefore he never received any plea offers to discuss with the petitioner. The post-conviction court accredited this testimony and found that the petitioner had failed to prove that counsel performed deficiently. We agree; counsel cannot be held deficient for failing to manufacture plea bargain offers from the state as the decision regarding whether to extend a plea bargain offer is solely at the state's discretion. See State v. Head, 971 S.W.2d 49, 51 (Tenn. Crim. App. 1997).

Next, the petitioner alleges that counsel failed to investigate his mental health history, which could have provided a basis for a defense theory. The post-conviction court noted that the mental health records that the petitioner submitted to the court for review chronicle the petitioner's mental health treatment from 1994 to 1995, during which time the petitioner was diagnosed with schizoaffective disorder and passive aggressive personality traits, for which he received medication. The post-conviction court reasoned that this "snapshot" of

the petitioner's mental health from 1994 to January 1995 did not illuminate his mental condition on the date of the crime, February 21, 1999, or at the time of the petitioner's trial, July 24-26, 2000. The court, therefore, concluded that the petitioner had failed to present any evidence that he suffered from a mental condition at the time of his crime, or if he did suffer from a mental deficiency, that it would have provided a legal defense or rendered him incompetent to stand trial.

We find the post-conviction court's findings apt; to establish a viable mental defect defense theory, a defendant must present "psychiatric evidence that [he] lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged." State v. Hall, 958 S.W.2d 679, 689 (Tenn. 1997). Evidence of the petitioner's mental state in 1994 and 1995 does not establish that he lacked the capacity to form the mens rea for first degree murder in 1999, and the petitioner offered no other evidence in the evidentiary hearing to establish that a defense based upon mental disease or defect would have been supportable or efficacious. Moreover, the petitioner and his counsel both testified that they did not believe that a mental health evaluation was needed prior to trial. Accordingly, we find that the petitioner has failed to establish either deficient performance or prejudice resulting from counsel's representation.

*   *   *

Finally, the petitioner contends that his counsel provided deficient representation by failing to request a mistrial after a state's witness testified that he had been involved in another murder prior to the homicide for which he was currently on trial. In the petitioner's direct appeal, this court addressed the issue whether the trial court erred by failing to declare a mistrial sua sponte after this testimony was admitted. See State v. Christopher Duwan Robertson, No. M2001-00976-CCA-R3-CD, slip op. at 18 (Tenn. Crim. App., Nashville, Oct. 2, 2002). We found that it was not plain error for the trial court to fail to declare a mistrial and further opined that "[t]he trial court's subsequent denial of a mistrial despite the lack of a request suggests that any request for a mistrial on the part of the defendant may have been futile." Id. Based upon our earlier finding that a motion for a mistrial would likely have been futile coupled with counsel's testimony, which was accredited by the post-conviction court, that he did not move for a mistrial at the petitioner's request, we find that the petitioner has failed to demonstrate that counsel performed deficiently by failing to move for a mistrial or that but for this omission, the result of his trial would have been different.

In sum, none of the petitioner's allegations of ineffective assistance of counsel warrant relief, and the judgment of the post-conviction court is affirmed.

Id. at **1-3, 4 (emphasis added).

22

To establish ineffective assistance of counsel, Petitioner must demonstrate that under the totality of the circumstances, his trial counsel performed deficiently and that counsel's performance resulted in prejudice. Strickland v. Washington, 466 U.S. 668, 695 (1984). As the Supreme Court has explained:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687.

As to the "performance" inquiry, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id. at 688. Under Strickland, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. As to the duty to investigate:

> These standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case. As the Court of Appeals concluded, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for

23

further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decision, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Id. at 690-91.

In any event, Strickland directs that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 689, 691. As the Supreme Court noted, "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." Id. at 691 (emphasis added). Counsel's failure "to conduct constitutionally adequate pretrial investigation into potential evidence" can "hamper[] [their] ability to make strategic choices." Harries v. Bell, 417 F.3d 631, 639 (6th Cir. 2005). A court must examine not only to the individual errors of counsel, but must also view the effect of the errors cumulatively. See Draper v. Adams, 215 F.3d 1325, 2000 WL 712376, at *3 (6th Cir. May 23, 2000).

To establish prejudice due to his counsel's errors or omissions, Petitioner must establish a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Williams, 529 U.S. at 390-91. In a word, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors

24

of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." <u>Strickland</u>, 466 U.S. at 694.

As to the specific claims, Petitioner has failed as a matter of law to cite any Supreme Court holding that a trial counsel's failure to inquire about a plea offer constitutes ineffective assistance of counsel. The state courts' factual finding is that state prosecutors were not interested in a plea agreement. Trial counsel's assessment of the merits of a venire challenge is a strategic decision that cannot serve as a basis for habeas relief under <u>Strickland</u>. The Petitioner's mental health claim is not demonstrated to have a factual basis as of the time of the murder. Petitioner agreed with his counsel on this issue. Yet, the Court concludes that counsel's failure to request a mistrial after the mother's reference to Petitioner's alleged involvement in another murder constitutes for ineffectiveness of counsel. Yet, the Court also concludes that the state trial and appellate courts' findings of a lack of actual prejudice are not demonstrated to be demonstratively unreasonable.

Based upon the state court's factual findings, the Court concludes that there is not any factual support for these alleged failures of trial counsel. Thus, the state courts' rulings on Petitioner's ineffective assistance of counsel claims are neither unreasonable nor contrary to clearly established federal law.

### 3. Trial Court's Failure to give the Accomplice Testimony Instruction

Petitioner next claim is that the trial court violated his due process rights in failing to instruct the jury on the necessity for corroboration of accomplice testimony. In his amended petition, the Petitioner states this issue as follows: "In violation of the Due Process Clause, Robertson was deprived of his defense based on the State's lack of any independent evidence to

25

corroborate the allegations of accomplices." (Docket Entry No. 12, Amended Petition, p. 16).

On direct appeal, the Tennessee Court of Criminal Appeals ruled that the lack of a jury

instruction on this issue was a state law question. (Docket Entry No. 24, Addendum No. 2, pp.

12-16). Respondent contends that Petitioner never raised this claim as a federal constitutional

law claim in the state courts, but raised this issue under state law. Thus, Respondent contends

this claim is procedurally defaulted.

In any event, addressing this claim under state law issue on Petitioner's direct appeal, the

Tennessee Court of Criminal Appeals resolved the issue as follows:

> The defendant contends that the trial court should have allowed the jury to
> determine whether witnesses Karen Mullins and Michael Simpson were
> accomplices as a matter of fact. He argues that if the jury had found them to be
> accomplices, then no evidence existed to corroborate Mario Newbern's, Ms.
> Mullins', and Mr. Simpson's accounts of the offense or the defendant's
> involvement therein. The state contends that no evidence exists that Ms. Mullins
> or Mr. Simpson knowingly and voluntarily united with the defendant to kill the
> victim. We hold that the trial court should have instructed the jury to determine
> whether Ms. Mullins and Mr. Simpson were accomplices. Nevertheless, we hold
> that the trial court's failure to do so is harmless error because of the existence of
> corroborating evidence linking the defendant to the victim's murder.
>
> The defendant requested that the trial court instruct the jury that Karen Mullins,
> Mario Newbern, and Michael Simpson were accomplices. He argued that
> evidence placed Mr. Newbern and Mr. Simpson at the scene at the time the victim
> was shot and that DeQuan Howse's testimony that he saw someone in a white
> jacket with the shooter at the time of the murder implicated Ms. Mullins in the
> offense. The trial court refused to give the instruction as to Ms. Mullins and Mr.
> Simpson ruling that a person's mere presence at the scene of a crime does not
> make him or her an accomplice but that the accomplice must join in the crime
> voluntarily, knowingly, and with shared intent. It found that "there isn't a whit of
> evidence from anybody that [Ms. Mullins] was even there." With regard to Mr.
> Simpson, it found that he "heard nothing, and there is nothing to the contrary, you
> know, saying that he was there and was in a position and could have heard, you
> know, is, you know, not sufficient because his testimony is he didn't hear
> anything." The trial court found that Mr. Simpson was not an accomplice simply
> because he accompanied the defendant and the others to Alameda Terrace.

26

**The trial court gave the following accomplice instruction for Mr. Newbern:**

**An accomplice is a person who joins another person in committing a crime. The accomplice must do so knowingly, voluntarily, and sharing the intent of the other person in doing the crime. In this case, it is a question for you to determine whether the witness, Mario Newbern, was an accomplice in this alleged crime. If you find that a witness is an accomplice, then you must find that the accomplice's testimony is supported by other evidence. The testimony of an accomplice by itself cannot convict the defendant. This other evidence must independently lead to the conclusion that a crime was committed and that the defendant was involved in it. This other supporting evidence must connect the defendant to the crime. The supporting evidence may be direct or circumstantial, and it need not be sufficient by itself to justify a conviction. The supporting evidence is enough if it fairly and legitimately tends to connect the defendant with the crime charge[d]. It is for you, the jury, to decide whether an accomplice's testimony has been sufficiently supported by the evidence.**

It is well settled in Tennessee that a conviction may not be based upon the uncorroborated testimony of an accomplice. See State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). An accomplice is an individual who knowingly, voluntarily, and with common intent participates with the principal offender in the commission of an offense. State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). Neither guilty knowledge nor participation in a related but distinct crime is sufficient to make a witness an accomplice. State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988). "Mere presence at the scene of the crime does not make one an accomplice, nor does the mere fact that one was indicted for the same offense as the accused." Letner v. State, 512 S.W.2d 643, 647 (Tenn. Crim. App. 1974). On the other hand, generally, a common test is whether the witness could have been indicted for the offense along with the accused. Monts v. State, 214 Tenn. 171, 191-92, 379 S.W.2d 34, 43 (1968); State v. Perkinson, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992). Finally, being an accessory after the fact does not make one an accomplice whose testimony must be corroborated. Monts, 214 Tenn. at 192, 379 S.W.2d at 43; Pennington v. State, 478 S.W.2d 892, 897 (Tenn. Crim. App. 1971).

In the present case, the discussion concerning the defendant's request for the accomplice instruction reveals that the trial court instructed the jury to determine whether Mr. Newbern was an accomplice based upon his presence at the time the victim was shot, his overhearing the defendant threaten to kill the victim shortly before the shooting, and his leaving with the defendant and the others after hearing the threat. Viewing the evidence in the light most favorable to the defendant, the same factors were present for Ms. Mullins. See, e.g., Perkinson, 867 S.W.2d at 7 (viewing the evidence in the light most favorable to the defendant

Case 3:06-cv-01155   Document 47   Filed 02/10/10   Page 27 of 31 PageID #: 1357

in determining whether the trial court should have given an accomplice instruction). Ms. Mullins testified that she overheard the defendant threaten to kill the victim at Ms. Wilson's apartment on the evening of the victim's death. DeQuan Howse testified that a person in a white coat was present when the victim was shot. Erica Howse testified that five minutes after she heard a gunshot, Ms. Mullins arrived at her apartment wearing a white, South Pole bomber jacket. Shonda Howse testified that ten to fifteen minutes after the gunshot, Ms. Mullins came to her door wearing a white coat. On cross-examination, Mr. Newbern admitted that Ms. Mullins was wearing a white jacket on the night of the murder. This testimony suggests that Ms. Mullins was present when the victim was shot after having heard the defendant threaten to kill the victim.

With regard to Mr. Simpson, he testified that he was present when the defendant shot the victim. He denied hearing the defendant threaten the victim before leaving for Alameda Terrace but explained that he was not paying attention to what the defendant was saying. Both Mr. Newbern and Ms. Mullins testified that Mr. Simpson was present when the defendant made the threat. Ms. Mullins testified that Mr. Simpson heard the threat and that if he denied hearing it, he would be lying. Viewing this evidence in the light most favorable to the defendant, it suggests that shortly before the shooting, Mr. Simpson heard the defendant threaten to kill the victim and then he accompanied the defendant, the victim, and Mr. Newbern to Alameda Terrace. Thus, we believe that the trial court erred in finding that no evidence existed to place Ms. Mullins at the scene of the murder or to show that Mr. Simpson overheard the defendant's threat to kill the victim.

We turn to the question of whether overhearing the threat to kill, then leaving with the person making the threat and his intended victim, and presence at the time of the shooting creates a jury question about whether the witness is an accomplice. In Pennington, this court faced a fact pattern similar to that in the present case in addressing the defendants' contentions regarding accomplice testimony. In the case, the state's witnesses Brenda and Robert Lawson were initially indicted with the three defendants, but their cases were severed, and the Lawsons were subsequently convicted of involuntary manslaughter. Brenda Lawson testified that she was driving around with her husband on the evening of the murder and that they eventually picked up the three defendants with whom they continued to drive around and drink beer. At one point, one of the defendants obtained a shotgun. At the direction of one of the defendants, Clifton Pennington, Ms. Lawson drove to the victim's house. Clifton Pennington announced his intention to rob the victim, and Mr. Lawson attempted to dissuade him from committing the crime. Pennington threatened to beat the Lawsons and kill their entire family if they said anything or tried to leave. During the robbery and murder of the victim, the Lawsons and one of the unarmed defendants remained in the car. Afterward, the other two defendants returned to the car and directed the Lawsons to drive away.

28

The Lawsons spent the next several days with the defendants who forced the Lawsons to take them out of state. This court held that whether the Lawsons were accomplices was a matter for the jury. Pennington, 478 S.W.2d at 898 (presuming that the trial court instructed the jury on accomplice testimony because the defendants did not object to the jury charge nor include it in the bill of exceptions).

Similar to the witnesses in Pennington, if the evidence is viewed in the light most favorable to the defendant, Mr. Newbern, Mr. Simpson, and Ms. Mullins knew of the defendant's intention to kill the victim and yet remained with him. Making the inferences in the defendant's favor, the situation is even more suggestive of intent than that in Pennington where the alleged accomplices waited in the car during the commission of the crime. In the present case, we believe that the witnesses' leaving with the defendant and the intended victim after hearing the threat to kill creates the inference that the witnesses shared the common intent to commit the crime. Evidence exists from which a jury could infer that the witnesses in question assisted the defendant in committing the crime. For this reason, the trial court should have allowed the jury to determine whether Ms. Mullins and Mr. Simpson were accomplices as a matter of fact.

The defendant contends that he was harmed by the trial court's failure to give his requested accomplice instruction because aside from the testimony of Mr. Newbern, Mr. Simpson, and Ms. Mullins, no independent evidence implicates him in the victim's murder. To corroborate the testimony of an accomplice,

> there must be some fact testified to, entirely independent of the
> accomplice's testimony, which, taken by itself, leads to the
> inference, not only that a crime has been committed, but also that
> the defendant is implicated in it; and this independent
> corroborative testimony must also include some fact establishing
> the defendant's identity. This corroborative evidence may be direct
> or entirely circumstantial, and it need not be adequate, in and of
> itself, to support a conviction; it is sufficient to meet the
> requirements of the rule if it fairly and legitimately tends to
> connect the defendant with the commission of the crime charged. It
> is not necessary that the corroboration extend to every part of the
> accomplice's evidence. The corroboration need not be conclusive,
> but it is sufficient if this evidence, of itself, tends to connect the
> defendant with the commission of the offense, although the
> evidence be slight and entitled, when standing alone, to but little
> consideration.

Hawkins v. State, 4 Tenn. Crim. App. 121, 133, 469 S.W.2d 515, 520 (1971) (citations omitted). The testimony of one accomplice may not corroborate the

29

testimony of another accomplice. State v. Allen, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). Whether an accomplice's testimony is sufficiently corroborated is a matter entrusted to the jury. Stanley v. State, 189 Tenn. 110, 117-18, 222 S.W.2d 384, 387 (1949).

In the present case, no physical evidence connects the defendant with the crime. Aside from the testimony of Mr. Newbern, Mr. Simpson, and Ms. Mullins, the only other testimony about the offense itself was that of DeQuan Howse. DeQuan Howse testified that on the night of the victim's death, he saw from his bedroom window a woman pleading for her life with a figure in a white coat and a man dressed all in black. He testified that the man in black shot the victim but that the man did not look like the defendant, who was his cousin. Due to the unique circumstances of this case, we believe that the jury could not have determined that Mr. Newbern, Mr. Simpson, and Ms. Mullins were all accomplices. Mr. Simpson and Mr. Newbern testified that Ms. Mullins was not there at the time of the shooting. Thus, the jury could have found that Mr. Newbern and Mr. Simpson were accomplices and that Ms. Mullins was not present when the victim was killed. Alternatively, DeQuan Howse testified that he saw two people with the victim. The jury could have found that Ms. Mullins was an accomplice and that either Mr. Newbern, Mr. Simpson, or the defendant were with her at the scene. Any suggestion that Ms. Mullins was at the scene with Mr. Newbern and Mr. Simpson is merely speculative under the evidence submitted.

In light of the two possible versions for the commission of the crime, corroborating evidence exists for all three witnesses. If the jury found that Mr. Newbern and Mr. Simpson were accomplices, then Ms. Mullins' testimony that the defendant admitted the crime to her corroborates their testimony and ties the defendant to the murder. If the jury found Ms. Mullins to be an accomplice, then the testimony of Mr. Newbern and Mr. Simpson corroborates her account and identifies the defendant as the one who shot the victim. We conclude that although the trial court should have instructed the jury to determine whether Ms. Mullins and Mr. Simpson were accomplices, the defendant was not harmed by this error due to existing corroborative evidence. See T.R.A.P. 36(b); State v. Maddox, 957 S.W.2d 547, 554 (Tenn. Crim. App. 1997) (noting that this court has analyzed the failure to instruct on accomplice testimony under the harmless error standard found in T.R.A.P. 36(b)); State v. Carpenter, 773 S.W.2d 1, 12 (Tenn. Crim. App. 1989) (applying a harmless error standard).

Robertson, 2002 WL 31188228, at **12-16 (emphasis added).

For habeas corpus relief based upon jury instructions, a habeas petitioner must show more

than that the instructions are undesirable, erroneous or universally condemned; rather, the issue is

30

whether, taken as a whole, the jury instructions are so infirm that they rendered the entire trial fundamentally unfair. Henderson v. Kibbe, 431 U.S. 145, 154 (1977). Accord Estelle, 502 U.S. at 72, 73 ("[w]e also bear in mind our previous admonition that we `have defined the category of infractions that violate "fundamental fairness" very narrowly.'" (quoting Dowling v. United States, 493 U.S. 342 (1990)). As an example of jury instructions offending this constitutional limitation, in Sandstrom v. Montana, 442 U.S. 510, 524 (1979), a jury instruction that presumes a person intends to commit the natural, ordinary and usual consequences of his voluntary actions unconstitutional.

Given the trial court's actual instruction on Tennessee law governing accomplices testimony, the Court concludes that this claim lacks a factual basis. The state courts' findings about the State witnesses were that given the trial court's instructions and the jury verdict these witnesses were not in fact accomplices. This Court concludes that the state appellate courts' ruling on this claim was not unreasonable nor contrary to federal law.

For these reasons, the petition should be denied and this action dismissed.

An appropriate Order is filed herewith.

**ENTERED** this the _18th_ day of February, 2010.

WILLIAM J. HAYNES, JR.
United States District Judge

31